**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

JEFFREY LAX,

                                        Plaintiff,                    16 Civ. 799 (LDH)(VMS)

                  -against-

THE CITY UNIVERSITY OF NEW YORK and            **Plaintiff's Rule 56.1**
STUART SUSS,                                    **Counterstatement of Facts**

                                        Defendants.

---------------------------------------------------------------X

          Plaintiff, Jeffrey Lax, submits the following Rule 56.1 counterstatement of facts:

**A.      Background**

    **I.      Plaintiff's History at Kingsborough**

          1.      Plaintiff Jeffrey Lax ("Plaintiff") has been employed by the City University of New

York ("CUNY") at Kingsborough Community College ("Kingsborough") since September 2004.

See Amended Complaint, filed June 2, 2016, ECF No. 13 ("Am. Compl."), Exhibit "A," ¶ 22; see

also Plaintiff's Deposition Transcript ("Pl. Tr."), Exhibit "B," at 28:25 – 29:3.

          *Response*

          Admit.

          2.      Plaintiff identifies himself as Jewish. See Am. Compl., Exhibit "A," ¶ 9; see also

Pl. Tr., Exhibit "B," at 121:21.

          *Response*

          Deny.  Plaintiff is an Orthodox, obvious, or outward Jew. (Stark Dec. Exhibit 1 p. 121:21-

24.)[1]

---
[1] References to (Stark Dec._) are to the Declaration of Corey Stark, which is dated January 16, 2018.

3.     Plaintiff began his employment at Kingsborough as an Assistant Professor in the Business Department and received tenure in that position in 2009. See Am. Compl., Exhibit "A," ¶¶ 22-24.

*Response*

Admit.

4.     In 2010, Kingsborough promoted Plaintiff to the rank of Associate Professor in the Business Department. See Am. Compl., Exhibit "A," ¶ 26.

*Response*

Admit.

5.     Stuart Suss was Vice President for Academic Affairs and Provost ("Provost") at Kingsborough from 1999 through his retirement in September 2015, except for a brief period from September 2013 through July 2014 when he served as Interim Acting President at Kingsborough. See Stuart Suss Deposition Transcript ("Suss Tr."), Exhibit "C," at 42: 1 – 43:18.

*Response*

Admit.

6.     During his time as Provost, Suss's decisions were subject to review by Kingsborough's president. See Pl. Tr., Exhibit "B," at 233: 6-8.

*Response*

Deny.   No testimony confirms that Suss's decisions were subject to review by Kingsborough's president.  The authority upon which Defendants rely to support this contention concerns Suss's manipulation of the composition of the P&B Committee and missing articles from Plaintiff's file, which were part of Suss's scheme to prevent Plaintiff and other Orthodox/outward Jew from obtaining promotions.  (Stark Dec. Exhibit 1 pp. 222:17-25, 233:1-6).

2

7.      Suss identifies himself as Jewish. See Suss Tr., Exhibit "C," at 36: 21-22; see also Pl. Tr., Exhibit "B," at 141: 8-10.

***Response***

Admit, except that unlike Plaintiff, Suss is not an Orthodox or outward Jew.  Also, Suss made negative comments about or complained about Jewish people and things associated with Judaism.  (Stark Dec. Exhibit 1 pp. 341:4-15; Exhibit 2 pp. 23:25 – 25:5.)

8.      Suss voted to promote Plaintiff to the title of Associate Professor in May 2010. See Pl. Tr., Exhibit "B," at 185: 19 – 186: 14.

***Response***

Admit, except Suss had not met or interacted with Plaintiff at this time.   It was Plaintiff's predecessor who selected him to serve as Chair of the Business Department.  (Stark Dec. Exhibit 1 pp. 182:21–183:10.)

9.      As a department chair, Plaintiff reported to Suss in Suss's capacity as both Provost and Interim President. See Pl. Tr., Exhibit "B," at 141: 2-4.

***Response***

Admit.

## II.     Plaintiff's Selection as Business Department Chair

10.     In January 2011, Plaintiff was appointed Chair of the Business Department at Kingsborough ("Business Department Chair"). See Pl. Tr., Exhibit "B," at 55:10-15.

***Response***

Admit, except that it was Plaintiff's predecessor who selected him to serve as Chair of the Business Department.  (Stark Dec. Exhibit 1 pp. 182:21–183:10.)

11.     Suss selected Plaintiff for the role of Business Department Chair in January 2011. See PSC Grievance, dated March 3, 2011, Exhibit "D."

**Response**

Deny.  Plaintiff's predecessor selected him to serve as Chair of the Business Department, which then elected Plaintiff as Chair.  (Stark Dec. Exhibit 1 pp. 182:21–183:10.)

12.     Plaintiff served as appointed Business Department Chair from January 2011 until May 2011, when a committee elected him to the position. See Pl. Tr., Exhibit "B," at 58: 8-17, 183: 8-22.

**Response**

Deny.  Plaintiff was appointed to perform the duties of the Chair on an interim basis but was not appointed to the position under CUNY by-laws.

13.     As Business Department Chair, Plaintiff was responsible for "representing the Department on college-wide committees," "supervising" faculty and staff, and acting as the "chair of the [Personnel & Budget] Committee for the department." See Pl. Tr., Exhibit "B," at 56: 9-16; 60: 11-15.

**Response**

Admit.

**III.     Anna Geller's EEO Complaint Against Plaintiff**

14.     Untenured full-time Kingsborough faculty are either reappointed or non-reappointed annually until they obtain tenure or a certificate of continued employment. See Pl. Tr., Exhibit "B," at 69: 8-9.

4

*Response*

No response is required for this statement because it does not contain any facts material to the determination of Defendants' motion.

15.     The decision to reappoint or non-reappoint a full-time faculty member is initially made by vote of the Departmental Personnel and Budget Committee ("Departmental P&B Committee"). See Pl. Tr., Exhibit "B," at 69: 8-9; see also Am. Compl., Exhibit "A," ¶ 92.

*Response*

No response is required for this statement because it does not contain any facts material to the determination of Defendants' motion.

16.     If an untenured faculty member is non-reappointed by the Departmental P&B Committee, that faculty member may appeal to the President of Kingsborough or to an appeals review committee. See Pl. Tr., Exhibit "B," at 71: 17 – 72: 10, 73: 24 – 74: 5.

*Response*

No response is required for this statement because it does not contain any facts material to the determination of Defendants' motion.  It should be noted, however, that Suss tried to strip Plaintiff of the right to appeal, which occurred after Suss manipulated the May 2013 P&B Committee vote for promotions in a blatant attempt to preclude Orthodox and obvious Jews from obtaining promotions.  (Stark Dec. Exhibit 1 pp. 241:17-20, 242:1-25, 252:13-23, 254:13-23, 300:17-19; Exhibit 2 pp. 100:1-101:25, 183:12-18, 184:12-25, 200:15-201:9, Exhibit 7; Exhibit 8 pp. 77:1-18, 102:20-103:9; Exhibit 9; Exhibit 10, and Defendants' Exhibit O.)

17.     Anna Geller was an untenured Kingsborough faculty member in the Business Department from 2012 to 2017. See Anna Geller Deposition Transcript ("Geller Tr."), Exhibit "E," at 25: 15-24.

*Response*

No response is required for this statement because it does not contain any facts material to the determination of Defendants' motion.

Plaintiff supervised Geller as her department chair. See Pl. Tr., Exhibit "B," at 464: 9-10; see also Geller Tr., Exhibit "E," at 26: 22.

*Response*

No response is required for this statement because it does not contain any facts material to the determination of Defendants' motion.

19.     Geller identifies herself as Jewish. See Geller Tr., Exhibit "E," at 17: 18- 21.

*Response*

Deny.  Geller is certainly not an Orthodox or outward Jew, and her religion is unclear.   She poses in and disseminates Christmas cards.  Plaintiff did not believe that Geller is Jewish.  (Stark Dec. Exhibit 1 p. 373:4-9.)

20.     Geller was non-reappointed on four different occasions from 2012 through 2016 by vote of the Business Department P&B Committee. See Geller Tr., Exhibit "E," at 31: 21-25.

*Response*

No response is required for this statement because it does not contain any facts material to the determination of Defendants' proposed motion.

21.     Geller filed an internal appeal regarding each non-reappointment. See Geller Tr., Exhibit "E," at 29: 16-19, 33: 19.

*Response*

No response is required for this statement because it does not contain any facts material to the determination of Defendants' motion.

22.     Suss reversed Geller's non-reappointment on at least one occasion. See Suss Tr., Exhibit "C," at 237: 15-22.

**Response**

No response is required for this statement because it does not contain any facts material to the determination of Defendants' motion.

23.     In December 2013, Geller filed an internal equal employment opportunity ("EEO") complaint against Plaintiff, alleging that Plaintiff discriminated and retaliated against her. See Am. Compl., Exhibit "A," at ¶ 82; see also Pl. Tr., Exhibit "B," at 461: 16-20.

**Response**

Admit.

24.     After CUNY conducted an internal investigation into Geller's EEO complaint, CUNY concluded in June 2015 that Plaintiff had not discriminated against Geller, but had retaliated against her. See Pl. Tr., Exhibit "B," at 545: 14-16.

**Response**

Admit.  The result is attributable to and supports Plaintiff's claim that he was retaliated against by Kingsborough's Legal Counsel, Julie Block-Rosen.  In March 2014 Plaintiff presented Block-Rosen with a complaint of religious discrimination.  Instead of processing the complaint for investigation, as is required, Block-Rosen refused to speak to him or to anyone who supported his religious discrimination complaint, specifically Rina Yarmish.  Block-Rosen refused to provide legal advice in matters related to the performance of their official duties by Plaintiff and Yarmish.  One of the duties of the Legal Counsel is to provide guidance on compliance with federal, state, and local anti-discrimination laws (the CUNY anti-retaliation policy is broader than federal, state, and local laws and has a lower threshold), and such guidance is available to those seeking to act in

the interests of the college, including department chairs such as Plaintiff. Yet when Plaintiff was forced to contend with a meritless complaint of discrimination against Plaintiff, Block-Rosen refused Plaintiff's multiple requests for legal advice, forcing Plaintiff, in his capacity as chair of the department, to act without the benefit of legal guidance. Accordingly, when Plaintiff questioned whether Anna Geller had following the proper procedure in requesting paid parental leave and failing to provide the required ninety days' notice, and then assigned Geller a schedule, Geller accused him, unjustly, of retaliation. Block-Rosen similarly refused to provide Yarmish with legal advice after Yarmish responded to the President's solicitation for faculty advice, which Yarmish did for the benefit of Kingsborough.[2] Block-Rosen's dereliction, in declining to assist both Plaintiff and Yarmish in the discharge of their duty, within their respective official capacity as department chairman and faculty member, constitutes retaliation. (Stark Dec. Exhibit 1 pp. 153:16-25; Exhibit 3 pp. 67:8-12, 119:15-25, 120:1-8, 206:17-18, 240:14-15; Exhibit 4 pp. 88:12 20, 121:1-13, 134:4-8; Exhibit 5 pp. 104-110.)

25. Plaintiff filed a charge of employment discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") approximately two months after CUNY's June 2015 finding of retaliation. See EEOC Data Entry Form, dated November 25, 2015, Exhibit "F."

*Response*

Admit, except that Plaintiff also made multiple internal complaints of discrimination before he filed a charge of discrimination with the EEOC, yet managers/administrators failed to follow required procedure by not referring those complaints to the Chief Diversity Officer. (Stark Dec.

---

[2] Yarmish has complained that Block-Rosen's conduct was motivated by religious discrimination and retaliation because Yarmish supports Plaintiff's discrimination claims. The Chief Diversity Officer, Victoria Ajibade, never investigated the matter and therefore never made a determination whether Block-Rosen had discriminated and retaliated against Yarmish, because Block-Rosen had already been disciplined for this conduct. According to Block-Rosen, however, she was not disciplined, and no evidence can be found in her personnel file of any discipline she received for discriminating or retaliating against Yarmish. (Stark Dec Exhibit 3 p.108:24-25; Exhibit 4 pp. 143-144; Exhibit 6 pp. 90:21-91-94:7.)

Exhibit 1 pp. 471:12-25, 472:1, 526: 7-25, 527:1-25, 528:1-12; Exhibit 2 pp. 240:22-241:10, 246:18-247:3, 249:17-23, 250:17-23; Exhibit 3 pp. 126:5-14, 131:3-9139:22-140:8; Exhibit 4 pp. 93:3-18, 106:4-16, 143:2-144:7, 183:12-184:2; Exhibit 6 pp. 51:14-52:23; Exhibit 12 pp. 52:20-53:10, 54:2-14, 55:17-22, 57:1-17, 70:7-71:12, 77:17-78:20, 80:3-14, 103:6-104:8, 111:3-113:9, 128:10-129:5, 140:23-141:10.)

### IV. Plaintiff's EEOC Charge Filing & Action Filing

26.     Plaintiff filed a charge of employment discrimination with the EEOC on August 4, 2015. See EEOC Data Entry Form, dated November 25, 2015, Exhibit "F."

*Response*

Admit.

27.     Plaintiff did not cross-file his discrimination charge with either a state or local employment agency in New York. See Letter, dated August 3, 2015, from Jeffrey Lax to EEOC, Exhibit "G."

*Response*

Admit that *Plaintiff did not* cross file his charge of discrimination.  Pursuant to a work sharing agreement, however, the EEOC and NYSDHR have each designated the other as an agent for purposes of receiving discrimination complaints.  Under this agreement, even when a complaint is physically filed with the EEOC, it is "deemed" to have been "initially" filed with the NYSDHR, entitling a plaintiff to rely on the 300–day limitation period.

28.     Plaintiff filed a Notice of Claim with CUNY on August 19, 2015. See Notice of Claim, filed August 19, 2015, Exhibit "H."

*Response*

Admit.

9

29.     Plaintiff filed his original complaint in the instant action on February 16, 2016. See ECF No. 1; see also Am. Compl., Exhibit "A," at ¶ 124.

***Response***

Admit.

**B.     Plaintiff's Discrimination Allegations:**

30.     Plaintiff alleges that Defendants singled him out for harassment and treated him disparately as compared to similarly situated non-Jewish employees. See Am. Compl., Exhibit "A," at ¶¶ 66-67, See Pl. Tr., Exhibit "B," at 121: 15-19.

***Response***

Admit.

31.     Plaintiff believes Suss was the only individual at Kingsborough who discriminated against him based upon his religion. See Pl. Tr., Exhibit "B," at 136: 10 – 138: 13.

***Response***

Deny.   Farley Herzek also discriminated against Plaintiff by treating him differently because of his religion.   In addition, Suss, Herzek, Block-Rosen and others retaliated against Plaintiff.  (Stark Dec Exhibit 1 pp. 139:9-13, 153:19-25; Exhibit 3 pp. 67:8-12, 206:17-18, 240:14-25; Exhibit 4 pp. 88:12-20, 134:4-8, 210:22-25.)

32.     Plaintiff believes that Kingsborough President Farley Herzek "treated him differently" but does not believe that Herzek "discriminated against" him. See Pl. Tr., Exhibit "B," at 137: 9–138:13.

*Response*

Deny. Disparate treatment based on religion is the very definition of discrimination. Farley Herzek discriminated against Plaintiff by treating him differently because of his religion. (Stark Dec. Exhibit 1 p. 138 9–13.)

33.     Herzek identifies himself as Jewish. See Pl. Tr., Exhibit "B," at 147: 3-5.

*Response*

Admit, except Plaintiff does not believe that Herzek is an Orthodox Jew. (Stark Dec. Exhibit 1 p. 147: 10 – 11.)

**I.     2013 Professor Promotion**

34.     At Kingsborough, faculty promotions proceed through two types of Personnel and Budget ("P&B") Committees as well as a Sub-Committee on Promotion. See Am. Compl., Exhibit "A," ¶ 37; see also Pl. Tr., Exhibit "B," at 99: 9–101:3.

*Response*

Admit.

35. The first type of P&B committee – the Departmental Level P&B Committee – is comprised of departmental faculty members and chaired by the department chair. See Am. Compl., Exhibit "A," ¶ 39; see also Pl. Tr., Exhibit "B," at 99: 14-21, 100: 6-23.

*Response*

Admit.

36.     The second type of P&B committee – the College-Wide P&B Committee – is comprised of all Kingsborough department chairs as well as the Provost, and typically includes approximately 15 members. See Pl. Tr., Exhibit "B," at 101: 19 – 102: 9.

*Response*

Admit.

37.    Before the College-Wide P&B Committee decides on a promotion case, an independent Sub-Committee on Promotion ("Review Sub-Committee") reviews the applicant's materials and renders a recommendation to the College-Wide P&B Committee as to whether the applicant should receive a promotion. See Pl. Tr., Exhibit "B," at 99: 9 – 101: 3.

*Response*

Admit.

38.    After the Departmental P&B Committee votes and the Review Sub-Committee renders its recommendation, the College-Wide P&B Committee convenes, reviews the Sub-Committee recommendation and the applicant's file, and votes on promotion. See Pl. Tr., Exhibit "B," at 99: 9 – 101: 3.

*Response*

Admit.

39.    In his capacity as a department chair, Plaintiff served on both the Departmental and the College-Wide P&B Committees starting in January 2011 and voted on candidates for promotion, tenure, reappointment, and non-reappointment. See Pl. Tr., Exhibit "B," at 56: 9-16, 60: 11-15, 62: 16-20, 67: 21-23.

*Response*

Admit.

40.    In May 2013, Plaintiff sought a promotion from Associate Professor to Professor. See Am. Compl., Exhibit "A," at ¶ 68l; see also May 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "I."

*Response*

Admit.

41.    In a letter of recommendation for Plaintiff in connection with Plaintiff's application to Professor, Stuart Suss wrote: Jeffrey Lax represents all those qualities of teacher, scholar, leader that make Kingsborough what it is. I highly recommend Jeffrey for promotion. Letter, titled "Evaluation for Promotion to Full Professor for Jeffrey Lax," May 2013, Exhibit "J." See also Pl. Tr., Exhibit "B," at 577: 1-4.

*Response*

Admit, except that at the same time Suss deliberately omitted scholarly publications and other items of qualification that are expected in such a letter.  (Stark Dec. Exhibit 1 p. 577.)

42.    After being reviewed by the Review Sub-Committee and Departmental P&B Committee, Plaintiff's application for promotion to Professor first came before the College-Wide P&B Committee on May 23, 2013. See Am. Compl., Exhibit "A," at ¶ 68l. See also May 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "I."

*Response*

Admit.

43.    Fourteen (14) Associate Professors sought promotion to Professor at the May 23, 2013 College-Wide P&B Committee meeting. See May 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "I."

*Response*

Admit.

44.    At the May 23, 2013 College-Wide P&B Committee meeting, only department chairs who held the rank of Professor were permitted to vote on promotions to the rank of

Professor. *See* May 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "I." *See also* Pl. Tr., Exhibit "B," at 231: 7-13; Rina Yarmish Deposition Transcript ("Yarmish Tr."), Exhibit "K," at 107: 2-22.

*Response*

Deny.  CUNY by-laws require that all college-wide P&B Committee members with the rank of Associate Professor and Professor are entitled to vote.  Suss presided over the vote.  In an unprecedented maneuver, Suss prevented the committee members with a rank below Professor from voting.  Suss changed the rules because there were a number of Orthodox or obvious Jews up for promotion, and he wished to prevent them from obtaining the title of Professor.  Suss's scheme worked: four of the five persons who were denied a promotion to Professor were Orthodox or obvious Jews.  (Stark Dec. Exhibit 1 pp. 223:25-224:17, 226:1-227:8, 231:2-10, 241:13-20; Exhibit 2 pp. 86:15-87:7, 97:7-14, 99:6-100:4, 117:23-118:15; Exhibit 8 pp. 105:12-17, 106:8-11, 107:9-109:21.)

45.    All department chairs with the rank of Professor who were present at the May 2013 meeting were permitted to vote on all of the candidates seeking promotion, regardless of the religion of the chairs or the candidates. *See* Pl. Tr., Exhibit "B," at 233: 21-25, 437: 17.

*Response*

Deny.   The by-laws require that all college-wide P&B Committee with the rank of Associate Professor and Professor were entitled to vote.  Suss presided over the vote.  (Suss 97). In an unprecedent maneuver, however, Suss prevented the committee members with a rank below Professor from voting.  Suss changed the rules because there were a number of Orthodox or obvious Jews up for this promotion, and he intended to prevent them from becoming attaining the title of Professor.  Suss's scheme worked, four of the five persons who were denied a promotion

to Professor were Orthodox or obvious Jews. (Stark Dec. Exhibit 1 pp. 223:25-224:17, 226:1-227:8, 231:2-10, 241:13-20; Exhibit 2 pp. 86:15-87:7, 97:7-14, 99:6-100:4, 117:23-118:15; Exhibit 8 pp. 105:12-17, 106:8-11, 107:9-109:21.)

46.     All five department chairs who were Associate Professors rather than full Professors, including Plaintiff, were not permitted to vote on the 14 promotional decisions at the May 23, 2013 meeting. See Pl. Tr., Exhibit "B," at 231: 4-6; see also May 23, 2013 College- Wide P&B Committee Meeting Minutes, Exhibit "I."

*Response*

Admit.

47.     Plaintiff does not assert that any of the other four Associate Professor department chairs who were not permitted to vote at the May 23, 2013 were Jewish, but Plaintiff does identify one as a Christian. See Pl. Tr., Exhibit "B," at 230: 6-23.

*Response*

This does not contain any facts material to the determination of Defendants' motion.  The religion of the persons Suss prevented from casting votes is immaterial.  What is important is that Suss has told multiple persons that there are too many Jews at Kingsborough, bragged about having votes in his pockets, and unilaterally changed the rules for this vote.  This unprecedented and illicit action succeeded in precluding four Orthodox or obvious Jews from receiving promotions.  In addition, there were inconsistencies Suss cannot account for in the number of persons who actually did cast votes.  For example, ten votes were recorded for Plaintiff while all other candidates received only nine votes.  Perhaps most important, one of the Jewish victims received the promotion through an appeal while two others, including Plaintiff, were promoted at the re-vote that was eventually required because Suss had violated CUNY by-laws by manipulating the first

15

vote. (Stark Dec. Exhibit 1 pp. 241:17-20, 242:1-242:25, 252:13-23, 254:13-23, 300:17-19; Exhibit 2 pp. 100:1-101:25, 183:12-18, 184:12-25, 200:15-201:9, Exhibit 7; Exhibit 8 pp. 77:1-18, 102:20-103:9; E; Goldstein Dec.; Defendants' Exhibit O.)

48.     Among those who voted at the May 23, 2013 meeting were multiple Committee members who identify themselves as Jewish including Suss and Rina Yarmish, Chair of the Math Department. See May 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "I;" see also Yarmish Tr., Exhibit "K," at 14: 25 – 15: 1, 102: 3-6.

*Response*

This does not contain any facts material to the determination of Defendants' motion. The religion of the persons Suss prevented from casting votes is immaterial. What is important is that Suss has told multiple persons that there were too many Jews at Kingsborough, bragged about having votes in his pockets, and unilaterally changed the rules for this vote. This unprecedented action succeeded in precluding four Orthodox or obvious Jews from receiving promotions. In addition, there were inconsistencies that Suss cannot account for in the number of persons who actually did cast votes. For example, ten votes were recorded for Plaintiff while all other candidates received only nine votes. Perhaps most important, one of the Jewish victims received a promotion through an appeal and two others, including Plaintiff, were promoted at the re-vote that was eventually required because Suss had violated CUNY by-laws by manipulating the first vote. (Stark Dec. Exhibit 1 pp. 241:17-20, 242:1-242:25, 252:13-23, 254:13-23, 300:17-19; Exhibit 2 pp. 100:1-101:25, 183:12-18, 184:12-25, 200:15-201:9, Exhibit 7; Exhibit 8 pp. 77:1-18, 102:20-103:9; Ferretti Dec.; Goldstein Dec.; Defendants' Exhibit O.)[3]

---

[3] References to (Ferretti Dec._) are to the Declaration of Eileen Ferretti, which is dated January 12, 2018. References to (Goldstein Dec._) are to the Declaration of Michael Goldstein, which is dated January 13, 2018.

49. As Provost, Suss had one of ten anonymous votes on the College-Wide P&B Committee when Plaintiff's promotion application came before the Committee in May 2013. See Pl. Tr., Exhibit "B," at 231: 9-13; see also Suss Tr., Exhibit "C," at 90: 24 – 91: 3.

*Response*

Admit.

50. Suss voted in favor of Plaintiff's promotion. See Suss Tr., Exhibit "C," at 103: 8-10.

*Response*

Deny. Nothing but Suss's self-serving testimony supports his averment that he voted in favor of Plaintiff's promotion, whereas ample irrefutable facts show that Suss did not want Plaintiff to be promoted. Suss has said numerous times, to multiple people, that there were too many Jews at Kingsborough, and he prevented people from voting just to prevent Orthodox or obvious Jews from being promoted. Although Suss precluded college-wide P&B Committee members from voting, he permitted a person who was not a committee member to cast a vote. This is even more significant than it seems, because Suss has claimed to have "votes in his pocket." At least two of the Orthodox or obvious Jews whose promotions were being considered have complained that the review committee did not review their publications in connection with their applications for promotion, and Suss's office is responsible for maintaining the publications. Suss attempted to deny Plaintiff the right to appeal the denial of his application for a promotion, but the college President overruled Suss after Plaintiff made a written complaint. Suss attempted to dissuade Plaintiff from pursuing his appeal and asked him to withdraw his candidacy for a promotion. After being forced to allow Plaintiff to appeal the denial of his promotion, Suss delayed and changed the members of the appeals committee to make sure that the committee members were not in favor of

17

granting Plaintiff's appeal. Finally, after the union forced a re-vote, Suss attempted to preclude the committee members from hearing Plaintiff's credentials and qualifications before casting their votes. (Stark Dec. Exhibit 1 pp. 227:23-25-228:1, 235:11-20, 236:12-20, 241:17-20, 242:1-25, 244:12-17 252:13-23, 254:13-23, 300:17-19, Exhibit 2 pp. 97:7-9, 100:1-101:25, 147:2-25, 183:11-25, 184:12-25, 185:8-12, 196:1-17, 199:14-16, 200:15-201:9; Exhibit 7; Exhibit 8 pp. 77:1-18, 102:20-103:9, 105:4-18; Exhibit 9, Exhibit 10, Exhibit 11; Exhibit 12 p. 72:8-22; Ferretti Dec.; Goldstein Dec.; Defendants' Exhibit O.)

51.      Of the 14 Associate Professors who were candidates for promotion on May 23, 2013, 9 were promoted to Professor as a result of the College-Wide P&B Committee vote. See May 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "I."

*Response*

Admit. Four of the five persons who were denied a promotion to Professor were Orthodox or obvious Jews. (Stark Dec. Exhibit 8 pp. 102:20-103:9.)

52.      All 9 of the candidates who were promoted received unanimously favorable Review Sub-Committee votes. See May 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "I."

*Response*

Admit. At least two of the Orthodox or obvious Jews, however, have complained that the review committee did not review their publications in connection with their applications for promotion. Both of these persons, and two others, were promoted after their true accomplishments and credentials were considered. (Stark Dec. Exhibit 1 pp. 143:22-145:12; Exhibit 8 pp. 105:8-17; Defendants' Exhibit O.)

53.     Elie Feder, who identifies himself as Jewish and wears a traditional kippah (yarmulke), was promoted to Professor at the May 23, 2013 Committee meeting. See Pl. Tr., Exhibit "B," at 248: 11-17; see also Yarmish Tr., Exhibit "K," at 74: 15-16, 103: 20-24.

*Response*

Admit.

54.     Of the 14 Associate Professors who sought promotion, five candidates, including Plaintiff, were not promoted to Professor as a result of the May 23, 2013 College-Wide P&B Committee vote. See May 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "I."

*Response*

Admit.  Four of the five persons who were denied promotion to Professor were Orthodox or obvious Jews.  Only the Jewish persons received less than four positive votes.  (Stark Dec. Exhibit 8 pp. 102:20-103:25; Defendants' Exhibit .)

55.     The Committee voted not to promote Plaintiff, Igor Balsim, Carla Beeber, Hope Parisi, and Rachel Sturm-Beiss. See May 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "I."

*Response*

Four of these persons who were denied a promotion to Professor (Plaintiff, Igor Balsim, Carla Beeber, and Rachel Sturm-Beiss) were Orthodox or obvious Jews.

56.     All five of the candidates who were not promoted received unanimously negative Review Sub-Committee votes. See May 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "I."

*Response*

Admit.  At least two of the Orthodox or obvious Jews, however, have complained that the review committee did not review their publications in connection with their applications for promotion.  Three of the four Orthodox or obvious Jews were prevented from being promoted as the result of Suss's manipulation of the voting process.  One of the Jewish victims received a promotion only after appealing, and two others, including Plaintiff, were promoted at the re-vote that was eventually mandated on account of Suss's violation of CUNY by-laws in having manipulating the first vote.  Carla Beeber did not receive a promotion.  (Stark Dec. Exhibit 1 pp. 235:11-20, 236:12-20, 249:12-17; Exhibit 2 pp. 105:13-25, 162:17-164:11; Exhibit 8 pp. 102:20-103:25; and Defendants' Exhibit O.)

57.     At the May 23, 2013 College-Wide P&B Committee meeting, the committee voted against Plaintiff's promotion by a vote of 3-6-1. See May 23, 2013 College- Wide P&B Committee Meeting Minutes, Exhibit "I."

*Response*

Admit, except four of the five persons who were denied a promotion to Professor were Orthodox or obvious Jews.  Only the Jewish persons received less than four positive votes.  (Stark Dec. Admit.  Four of the five persons who were denied promotion to Professor were Orthodox or obvious Jews.  Only the Jewish persons received less than four positive votes.  (Stark Dec. Exhibit 8 pp. 102:20-103:25; Defendants' Exhibit; Exhibit 7; Exhibit 8 pp. 102:20-103:25.)

58.     A notation listed in the Committee meeting's minutes next to Plaintiff's name and his 3-6-1 vote total reads "length of time in service/addendum to law journal." See May 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "I."

*Response*

Admit.  At least two of the Orthodox or obvious Jews, however, have complained that the review committee did not review their publications in connection with their applications for promotion.  Three of the four Orthodox or obvious Jews were prevented from being promoted as the result of Suss's manipulation of the voting process.  One of the Jewish victims received a promotion only after appealing, and two others, including Plaintiff, were promoted at the re-vote that was eventually mandated on account of Suss's violation of CUNY by-laws in having manipulating the first vote.  Carla Beeber did not receive a promotion.  (Stark Dec. Exhibit 1 pp. 235:11-20, 236:12-20, 249:12-17; Exhibit 2 105:13-25, 162:17-164:11; Exhibit 8 pp. 102:20-103:25; and Defendants' Exhibit O.)

59.    Plaintiff believes that none of the nine voters aside from Suss voted for or against Plaintiff based upon his religion. See Pl. Tr., Exhibit "B," at 235: 4-8.

*Response*

Deny.  Plaintiff believes that religious discrimination also motivated the votes of Loretta Taras.  Additionally, Suss has admitted that he "had votes in his pocket."  As a result, Suss obviously poisoned the voting pool.  (Stark Dec. Exhibit 2 p. 196:3-17.)

60.    At least one of the faculty members who did not receive a promotion to Professor at this meeting, Hope Parisi, does not identify herself as Jewish. See Pl. Tr., Exhibit "B," at 234: 10-15.

*Response*

Admit.

61.    The Professional Staff Congress ("PSC") – the faculty and academic staff union at CUNY – filed a June 10, 2013 grievance asserting that the Associate Professors should have been

21

permitted to vote at the May 23, 2013 meeting. See PSC Grievance, dated June 10, 2013, Exhibit "L; see also Yarmish Tr., Exhibit "K," at 107: 2-8.

*Response*

Admit.  The grievance was based on the fact that Suss had manipulated the college-wide P&B Committee vote.

62.    In response to PSC's grievance, Suss recommended Associate Professor chairs be permitted to vote for promotions at a new vote be held at the first College-wide P&B Committee meeting in Fall 2013. See Email, dated June 24, 2013 from Howard Prince to Julie Block-Rosen, Exhibit "M."

*Response*

Deny.  In response to the grievance, Suss insisted that the college by-laws supported the exclusion of those below the rank of Professor from voting on a promotion to Professor.  Suss then attempted to justify his exclusion of college-wide P&B members by claiming that the exclusion was based on Kingsborough tradition, which is false.  (Stark Dec. Exhibit 1 pp. 223:25-224:17; Exhibit 8 pp. 107:9-109:8; Ferretti Dec.)

63.    Plaintiff also internally appealed the P&B Committee's denial of his promotion to Professor by sending an appeal to Suss on July 31, 2013. See Am. Compl., Exhibit "A," at ¶ 75.; see also Letter from Jeffrey Lax to Stuart Suss, dated July 31, 2013, Exhibit "N."

*Response*

Deny.  Suss refused to hear Plaintiff's appeal.  Plaintiff was forced to ask the President to intercede in order to enforce his right to appeal.  The President forced Suss to allow Plaintiff to appeal.  Suss then delayed the appeal for months and installed a new appeals committee with

members whose votes were "in his pocket." (Stark Dec. Exhibit 2 pp, 166:22-168:18, 171:2-7; Exhibit 9; Exhibit 10.)

64. All unsuccessful candidates for promotion, including Plaintiff, were able to appeal to the Appeals Sub-Committee, which met in October 2013. See Pl. Tr., Exhibit "B," at 447: 8-13.

*Response*

Deny. Suss refused to hear Plaintiff's appeal. Plaintiff was forced to ask the President to intercede in order to enforce his right to appeal. The President forced Suss to allow Plaintiff to appeal. Suss then delayed the appeal for months and then installed a new appeals committee with members whose votes were "in his pocket." (Stark Dec. Exhibit 2 pp, 166:22-168:18, 171:2-7; Exhibit 9; Exhibit 12.)

65. The Appeals Sub-Committee reviewed appeals from professors who were denied the promotion to Professor in May 2013. See Email, dated June 24, 2013 from Howard Prince to Julie Block-Rosen, Exhibit "M."

*Response*

Deny. Suss delayed the appeal for months and then installed a new appeals committee with members whose votes were "in his pocket." (Stark Dec. Exhibit 2 pp, 166:22-168:18, 171:2-7; Exhibit 9; Exhibit 10; Exhibit 11.)

66. Igor Balsim, who identifies as Jewish, filed an individual internal appeal regarding the Committee's May 23, 2013 decision. See Pl. Tr., Exhibit "B," at 300: 20-22; see also Yarmish Tr., Exhibit "K" at 73: 16, 115: 15-19.

*Response*

Admit.

67.     Balsim's appeal was granted by the Sub-Committee on Appeals and he was promoted to the rank of Professor. See Pl. Tr., Exhibit "B," at 300: 17-19; see also Yarmish Tr., Exhibit "K," at 115: 15-19.

*Response*

Admit.

68.     In accordance with a settlement agreement between PSC and Kingsborough regarding the June 10, 2013 grievance, a re-vote took place on October 23, 2013 for the candidates (other than Balsim) who were not promoted to Professor at the May 23, 2013 meeting. See October 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "O."

*Response*

Admit.

69.     At the October 23, 2013 re-vote, the College-Wide P&B Committee voted to promote Plaintiff, Parisi, and Sturm-Beiss to the rank of Professor, retroactive to September 1, 2013. See October 23, 2013 College-Wide P&B Committee Meeting Minutes, Exhibit "O."

*Response*

Admit.

70.     The group of individuals who voted on promotions to Professor at the October 23, 2013 meeting voted on all of the candidates seeking promotion, regardless of the religion of the voters or the candidates. See Pl. Tr., Exhibit "B," at 233: 21-25, 438: 5.

*Response*

Deny.  The votes of Suss and Loretta Taras were motivated by religious bias.

71.     As a result of the Committee's October 23, 2013 revote, then Interim President Suss promoted Plaintiff to Professor, retroactively effective September 1, 2013, See Letter, dated

October 23, 2013, from Stuart Suss to Jeffrey Lax, Exhibit "P;" see also October 23, 2013 College-

Wide P&B Committee Meeting Minutes, Exhibit "O."

### Response

Admit that Plaintiff finally received the promotion, but only after Suss was forced to hold

a fair vote. Deny that Suss "promoted" Plaintiff. Suss continued to place Plaintiff at a

disadvantage by attempting, for the second time, to prevent the college-wide P&B Committee from

considering Plaintiff's full credentials. (Stark Dec. Exhibit 1 pp. 102:20-103:25; Defendants'

Exhibit O.)

### II.    2014 Salary Increase

72.    Plaintiff alleges that he requested a raise from Interim Provost David Gomez in

March 2014, but Suss, then Interim Acting President, denied the salary increase request. See Am.

Compl., Exhibit "A," at ¶¶ 79-81.

### Response

Deny. Plaintiff alleges that he sought a compensation increase from Suss but that Suss told

him that it was not he, Suss, but the Provost, David Gomez, who was responsible for addressing

requests for compensation increases. When Plaintiff then made the request to Gomez and Gomez

recommended the increase, Suss told Gomez to deny it. (Stark Dec. Exhibit 1 p. 454:10-25;

Exhibit 2 p. 203:3-9; Exhibit 12 p. 90:13-25.)

73.    Additionally, Plaintiff alleges that then Interim Acting President Suss granted

salary increases to non-Jewish faculty members. See Am. Compl., Exhibit "A," at ¶ 81.

*Response*

Admit that Suss was involved in obtaining compensation increases for Anthony Borgese, Michael Weisberg, and Harold Connolly. None of these persons is an Orthodox or obvious Jew. (Stark Dec Exhibit 2 pp. 205:3-207:23.)

74.    Department chairs' salaries are set in accordance with the collective bargaining agreement between PSC and CUNY ("PSC/CUNY CBA"). See PSC/CUNY CBA, Exhibit "Q."

*Response*

Admit, but increases are available. For example, Suss was involved in obtaining compensation increases for Anthony Borgese, Michael Weisberg, and Harold Connolly. None of these persons is an Orthodox or obvious Jew. In addition, Suss provided additional compensation to Taras, who was not the most senior faculty/administrator but was similarly committed to the cause of eliminating Jews. Taras was the highest paid department chair, and this includes receiving three-ninths' summer pay while other chairs received only one-ninth or two-ninths. (Stark Dec. Exhibit 2 pp. 205:3-207:23, 216:20-217:22; Exhibit 13 pp. 113:23-114:3; Exhibit 14.)

75.    The PSC/CUNY CBA establishes that department chairs are paid dependent based upon their time in service. See PSC/CUNY CBA, Exhibit "Q;" see also Pl. Tr., Exhibit "B," at 457: 19 – 458: 21.

*Response*

Admit, but increases are available. For example, Suss was involved in obtaining compensation increases for Anthony Borgese, Michael Weisberg, and Harold Connolly. None of these persons is an Orthodox or obvious Jew. In addition, Suss provided additional compensation to Taras, who was not the most senior faculty/administrator but was similarly committed to the cause of eliminating Jews. Taras was the highest paid department chair, and this includes receiving

26

three-ninths' summer pay while other chairs received only one-ninth or two-ninths.  (Stark Dec. Exhibit 2 pp. 205:3-207:23, 216:20-217:22; Exhibit 13 pp. 113:23-114:3; Exhibit 14.)

76.    Plaintiff's salary has been set in accordance with the PSC/CUNY CBA for the entirety of the relevant period. See PSC/CUNY CBA, Exhibit "Q;" see also Pl. Tr., Exhibit "B," at 457: 19 – 458: 21.

*Response*

Admit, but increases are available.  For example, Suss was involved in obtaining compensation increases for Anthony Borgese, Michael Weisberg, and Harold Connolly.  None of these persons is an Orthodox or obvious Jew.  In addition, Suss provided additional compensation to Taras, who was not the most senior faculty/administrator but was similarly committed to the cause of eliminating Jews. Taras was the highest paid department chair, and this includes receiving three-ninths' summer pay when other chairs received only one-ninth or two-ninths.  (Stark Dec. Exhibit 2 pp. 205:3-207:23, 216:20-217:22; Exhibit 13 pp. 113:23-114:3; Exhibit 14.)

77.    Anthony Borgese, who does not identify himself as Jewish, was the only department chair whom Suss recommended to receive an extra-contractual merit-based salary increase during the relevant time period. See Suss Tr., Exhibit "C," at 205: 6 – 210: 21; see also Pl. Tr., Exhibit "B," at 456: 7-10, 456: 22 – 457: 1, 461: 3-6.

*Response*

Deny.  Suss was also involved in obtaining compensation increases for faculty members Michael Weisberg and Harold Connolly.  None of these persons is an Orthodox or obvious Jew. In addition, Suss provided additional compensation to Taras, who was not the most senior faculty/administrator but was similarly committed to the cause of eliminating Jews. Taras was the highest paid department chair, and this includes receiving three-ninths' summer pay when other

chairs received only one-ninth or two-ninths.  (Stark Dec. Exhibit 2 pp. 205:3-207:23, 216:20-217:22; Exhibit 13 pp. 113:23-114:3; Exhibit 14.)

78.    Suss became aware of an employment offer Borgese received from St. John's University and subsequently offered Borgese a raise to persuade him to remain at Kingsborough. See Suss Tr., Exhibit "C," at 209: 14 – 210: 21.

**Response**

Admit.

79.    Except for Borgese, who was granted a merit-based raise as part of an employment counter-offer, no other department chair was granted a merit-based raise during the relevant time period. See Suss Tr., Exhibit "C," at 205: 6 – 210: 21.

**Response**

Deny.  Suss was involved in obtaining compensation increases for Anthony Borgese, Michael Weisberg, and Harold Connolly.  None of these persons is an Orthodox or obvious Jew. In addition, Suss provided additional compensation to Taras, who was not the most senior faculty/administrator but was similarly committed to the cause of eliminating Jews.  Taras was the highest paid Chair, and this includes receiving three-ninths' summer pay while other chairs receive only one-ninth or two-ninths. (Stark Dec. Exhibit 2 pp. 205:3-207:23, 216:20-217:22; Exhibit 13 pp. 113:23-114:3; Exhibit 14.)

80.    Plaintiff is unaware of which other individuals, if any, requested a salary increase from Suss and were denied an increase. See Pl. Tr., Exhibit "B," at 461: 2.

**Response**

Admit, but Suss summarily denied Plaintiff's request without making any attempt to obtain a compensation increase.  Suss supported and ultimately obtained compensation increases for at

least three faculty members who were not Orthodox or obvious Jews and rewarded Taras with additional compensation. (Stark Dec. Exhibit 2 pp. 204:2-6, 205:3-207:23, 216:20-217:22; Exhibit 13 pp. 113:23-114:3; Exhibit 14.)

### III. 2015 Director of eLearning Position

81. Plaintiff alleges that he was denied a "promotion" to Director of eLearning in September 2015. See Am. Compl., Exhibit "A," at ¶ 116; see also Pl. Tr., Exhibit "B," at 534: 21–538: 11.

*Response*

Deny.

82. The role of Director of eLearning was created by Kingsborough administration in 2015. It was created to fill an immediate operational need and was not a job for which candidates were publicly sought. See Loretta Taras Deposition Transcript ("Taras Tr."), Exhibit "R," at 47: 1-20; see also Pl. Tr., Exhibit "B," at 558: 7-9.

*Response*

Deny. Suss had already decided in June 2014 that Taras was moving on to administration. By awarding Taras a position in the administration Defendants violated policy, because the Chief Diversity Officer did not certify that the search was fair and diverse. (Stark Dec Exhibit 2 p. 260:13-16; Exhibit 13 p. 54:3-24.)

83. Loretta Taras, former Chair of the Biology Department, was selected as Director of eLearning in September 2015. See Taras Tr., Exhibit "R," at 51: 23 – 52: 4; see also Pl. Tr., Exhibit "B," at 558: 7-9.

*Response*

Admit.

29

84.     Taras had extensive work experience that qualified her for the Director of eLearning position, including several years spent working on Kingsborough's eLearning capabilities in connection with Kingsborough's reaccreditation by the Middle States Commission on Higher Education. See Taras Tr., Exhibit "R," at 51: 23 – 52: 4, 55: 22 – 60: 13.

*Response*

Deny.  The testimony does not reflect that Taras had extensive work experience or special qualifications.

85.     As a result of Taras's work on the Middle States reaccreditation, Reza Fakhari, a Kingsborough administrator, asked Taras to serve as the Director of eLearning, a newly-created position. See Taras Tr., Exhibit "R," at 51: 23 – 52: 4, 55: 22 – 60: 13.

*Response*

Deny.  Suss had already decided in June 2014 that Taras was moving on to administration. (Stark Dec Exhibit 2 p. 260:13-16.)

86.     Plaintiff did not have the experience Taras had of working on the eLearning aspects of Kingsborough's reaccreditation process. See Jeffrey Lax Curriculum Vitae, Exhibit "S."

*Response*

Deny.

87.     Taras had been tenured at Kingsborough for longer than Lax. See Pl. Tr., Exhibit "B," at 558: 7-9.

*Response*

Admit.

30

88. Suss played no role in the selection of the Director of eLearning position, as he retired in September 2015. See Suss Tr., Exhibit "C," at 42: 1 – 43: 18; see also Taras Tr., Exhibit "R," at 243: 16-18.

*Response*

Deny. Suss had already decided in June 2014 that Taras was moving on to administration. Moreover, Fakhari lacked the authority to make decisions of this kind without first getting Suss's approval. (Stark Dec Exhibit 2 p. 260:13-16.)

89. The position of Director of eLearning was not a promotion over department chair. See Taras Tr., Exhibit "R," at 51: 23 – 52: 4.

*Response*

Deny. Director of eLearning is a promotion and excuses Taras from teaching time to focus on administration.

90. As Director of eLearning, Taras supervises 2 people, while as Department Chair of the Biology Department, she had supervised approximately 60 people. See Taras Tr., Exhibit "R," at 42: 13-16, 64: 8-20.

*Response*

Admit.

91. As Director of eLearning, Taras is paid less than she was as a department chair. See Taras Tr., Exhibit "R," at 51: 23 – 52: 4.

*Response*

Deny. Although Taras was not the most senior faculty/administrator, she was the highest paid department chair, and this includes receiving three-ninths' summer pay when other chairs

31

received only one-ninth or two-ninths. (Stark Dec. Exhibit 2 pp. 216:20-217:22; Exhibit 13 pp. 113:23-114:3; Exhibit 14.)

IV.    **2015 Provost Search**

92.    Plaintiff alleges that he was denied an appointment to Provost at Kingsborough in November 2015 following Suss's retirement as Provost. See Pl. Tr., Exhibit "B," at 567: 4-10.

*Response*

Admit.

93.    Suss retired as Provost and left Kingsborough in September 2015. See Pl. Tr., Exhibit "B," at 138: 16-21.

*Response*

The testimony upon which Defendants' rely does not indicate that Suss retired as Provost and left Kingsborough in September 2015.  (Stark Dec. Exhibit 1 p. 138:16-21.)

94.    Suss had no decision-making authority in determining his replacement as Provost. See Provost Search Committee File Excerpts, Exhibit "T."

*Response*

Deny.  Defendants' Exhibit T does not show that Suss had no decision-making authority in determining his replacement as provost.

95.    The Provost hiring was conducted by a search committee in September and October of 2015 and was comprised of 14 Kingsborough faculty and administrators. See Provost Search Committee File Excerpts, Exhibit "T."

*Response*

Admit.

96. The Provost search committee reviewed the applications of 97 applicants, including Plaintiff's, and selected 9 individuals for in-person interviews. See Provost Search Committee File Excerpts, Exhibit "T;" see also Taras Tr., Exhibit "R," at 178: 5-13.

*Response*

Admit.

97. At least one person who identified as Jewish was selected for an interview. See Provost Search Committee File Excerpts, Exhibit "T."

*Response*

Admit.

98. Like the vast majority of candidates, Plaintiff was not selected for an interview and did not receive the position. See Pl. Tr., Exhibit "B," at 567: 4-10.

*Response*

Admit that Plaintiff was not selected for an interview and did not receive the position.

99. Multiple unsuccessful applicants were not Jewish, including Reza Fakhari. See Taras Tr., Exhibit "R," at 180: 20-22; see also Provost Search Committee File Excerpts, Exhibit "T."

*Response*

Admit.

100. Plaintiff does not claim that Joanne Russell, who was ultimately selected as Provost by the search committee, is less experienced or qualified than he is for the position of Provost. See Pl. Tr., Exhibit "B," at 568: 3-10.

*Response*

33

Deny. Plaintiff never comments on Joanne Russell's experience or qualifications in the testimony upon which Defendants' rely, and Defendants did not ask Plaintiff to compare his experience or qualifications to other people who were interviewed. (Stark Dec. Exhibit 1 p. 563:3-10.)

### V.  EEO Complaint Legal Assistance

101.  As to the internal EEO complaint which was filed against him by his subordinate, Anna Geller, in 2013, Plaintiff alleges that Defendants "denied Plaintiff access to legal counsel, refused to coach Plaintiff on how to protect against a retaliation claim, and prevented Plaintiff from participating in the settlement process and understanding the terms of a settlement agreement that was reached concerning the allegation" in connection with the complaint filed against him by Anna Geller. See Am. Compl., Exhibit "A," at ¶ 82, see also Pl. Tr., Exhibit "B," at 462: 12-15.

*Response*

Admit.

102.  Plaintiff is an attorney admitted to practice in New York, and has handled employment law matters, considers himself to have an "area of expertise" in Title VII law, and has written publications on employment law matters. See Pl. Tr., Exhibit "B," at 17: 17-25, 23: 16 – 24: 1, 51: 22 – 52: 20, 320: 18-20.

*Response*

Admit that Plaintiff is an attorney and has practiced some employment law more than a decade ago, but deny that Plaintiff considers anti-retaliation statutes an area of expertise. Plaintiff has testified that he has no area of specialty in an academic sense with respect to Title VII. (Stark Dec. Exhibit 1 pp. 17:17-25, 23:16 – 24:1, 51:22–52:20, 320:18-20.)

103.    After Geller filed her internal EEO complaint against Plaintiff, multiple Kingsborough administrators attempted to assist Plaintiff with his supervision of Geller, including Suss, Interim Acting Provost David Gomez, and Kingsborough President Farley Herzek. See Pl. Tr., Exhibit "B," at 467: 1-5, 478: 21-23.

*Response*

Deny.  Plaintiff testified that he had a single, limited discussion with Suss about Geller's schedule.  More than one year after Geller's complaint President Farley Herzek decided to provide some counsel to the department but not to Plaintiff.  President Farley Herzek also instructed Kingsborough's legal counsel that she should not provide Plaintiff with any counsel or advice. Block-Rosen refused to speak to Plaintiff at all about any subject.  In contrast, prior to filing his complaint about Suss's discrimination Plaintiff was permitted to speak to Kingsborough's legal counsel and obtain legal advice.  (Stark Dec. Exhibit 1 pp. 467:1-5, 478:21-23, 479:3-20; Exhibit 3 p. 240.)

104.    Plaintiff did not heed the advice of those administrators. See Pl. Tr., Exhibit "B," at 467: 10-12.

*Response*

Deny.  The testimony upon which Defendants rely does not show that Plaintiff failed to heed the advice of those administrators.  (Stark Dec. Exhibit 1 p. 467:10-12.)

105.    Plaintiff also alleges that in an "analogous circumstance," Defendants provided Anthony Borgese, a non-Jewish department chair, with access to legal counsel, gave him advice on how to avoid a retaliation claim, and permitted him to participate in the settlement process. See Am. Compl., Exhibit "A," at ¶ 83; See Pl. Tr., Exhibit "B," at 110: 18-23, 114: 19-24.

*Response*

Admit.

106.    Borgese was, with Kingsborough, sued in federal court for employment discrimination and was granted legal representation by the Office of the Corporation Counsel of the City of New York ("City Law Department"). See Pl. Tr., Exhibit "B," at 110: 18-23, 114: 19-24, 469: 1-13.

*Response*

A charge of discrimination was filed with the EEOC before Borgese was sued in federal Court.  (Stark Dec. Exhibit 15.)

107.    Julie Block-Rosen, Legal Counsel to Kingsborough, assisted in Borgese's representation after Borgese was sued along with Kingsborough in federal court. See Julie Block-Rosen Deposition Transcript ("Block-Rosen Tr."), Exhibit "U," at 122: 5 – 123: 20.

*Response*

Plaintiff lacks sufficient information to formulate an opinion or response.

108.    In contrast, Plaintiff was subject only to an internal EEO investigation at CUNY and was not sued in state or federal court. See Pl. Tr., Exhibit "B," at 461: 16 – 462: 15.

*Response*

Admit.

**VI.    Committee Assignments**

109.    Plaintiff alleges that Suss refused to allow Jewish faculty to serve on college committees during the 2013-2014 and 2014-2015 academic years, other than those committees to which certain faculty were already entitled by virtue of their positions as departmental chairpersons. See Am. Compl., Exhibit "A," at ¶ 51.

*Response*

Amit.

110.    Plaintiff also alleges that he issued "numerous requests to serve on committees," but that he was denied committee opportunities which were instead awarded to "less qualified non-Jewish faculty members." See Am. Compl., Exhibit "A," at ¶¶ 85-86.

*Response*

Admit.

111.    Plaintiff claims he was denied a seat on the search committee for Chief Diversity Officer. See Pl. Tr., Exhibit "B," at 330: 17-25.

*Response*

Admit.  Plaintiff was also denied a seat on a number of other committees, including but not limited to the following: the Middle States or Guidance Committee, the Vice President of Finance Committee, the Committee on Tenure, and the Committee on Promotion.  (Stark Dec. Exhibit 1 pp. 320:1–321:25; 330:17-25.)

112.    The Chief Diversity Officer search committee included members who were Jewish, including Julie Block-Rosen and Gila Rohr. See Pl. Tr., Exhibit "B," at 332: 24 –333: 10; see also Job Opening: Chief Diversity Officer, Exhibit "V."

*Response*

Deny.  Julie Block-Rosen is Jewish, but she is not an Orthodox Jew, and no evidence establishes that Gila Rohr is Jewish.  (Stark Dec. Exhibit 1 pp.  332:24–333:10.)

113.    The Chief Diversity Officer search committee did not include department chairs of any religion. See Pl. Tr., Exhibit "B," at 332: 10-19; see also Job Opening: Chief Diversity Officer, Exhibit "V."

37

*Response*

Admit.

114. Plaintiff also claims he was denied a seat on the search committee for Vice President of Finance after requesting a seat. See Pl. Tr., Exhibit "B," at 331: 1-8.

*Response*

Admit.

115. Suss, who identifies himself as Jewish, did not create this committee, but did serve on it. See Pl. Tr., Exhibit "B," at 336: 2; see also Job Opening: Vice President for Finance and Administration, Exhibit "W."

*Response*

Admit that the only Jewish member of the Vice President of Finance Committee was Suss. Suss is not an Orthodox or obvious Jew. Deny that Suss did not create the committee. Suss invited faculty to join the committee. (Stark Dec. Exhibit 1 pp. 328:15-329:9, 336:2; Exhibit 2 pp. 24:25-25:5.)

116. Plaintiff served as Chair of the Sub-Committee on Promotion to Professor during the 2014-2015 school year. See Pl. Tr., Exhibit "B," at 369: 24-25, 450: 1 – 454: 4.

*Response*

Admit, except this is one of the committees that must be comprised of department chairs.

117. Suss and Herzek placed Plaintiff on the Sub-Committee on Promotion to Professor. See Pl. Tr., Exhibit "B," at 370: 8-9, 450: 1 – 454: 4.

*Response*

Deny. Herzek appointed Plaintiff to the Sub-Committee on Promotion to Professor. (Stark Dec. Exhibit 1 p. 453:8–18.)

38

118.    The Sub-Committee on Promotion to Professor is a prestigious committee assignment at Kingsborough. See Pl. Tr., Exhibit "B," at 450: 1 – 454: 4.

**_Response_**

The testimony upon which Defendants rely does not make evident that the Sub-Committee on Promotion to Professor is a prestigious committee assignment at Kingsborough. (Stark Dec. Exhibit 1 pp. 450:1–454:4.)

119.    Plaintiff also served as one of only three faculty members on Kingsborough's search committee to select a new President in 2014. See Pl. Tr., Exhibit "B," at 350: 25 – 351: 8.

**_Response_**

Admit, except this was an elected committee.  The College Counsel members elected Plaintiff to serve on this committee.  Suss did not appoint Plaintiff or any member of this committee, and Suss referred to Plaintiff and Yarmish as the enemy in the context of this committee.  Moreover, the testimony upon which Defendants rely provides no support for the suggestion that Suss was involved in appointing Plaintiff to this committee. (388:9-25.)

**VII.    Adjunct Hiring at Kingsborough**

120.    Plaintiff, as the Business Department Chair, is involved in adjunct hiring. See Pl. Tr., Exhibit "B," at 77: 10-12.

**_Response_**

Admit.

121.    Plaintiff has hired former full-time faculty members to fill vacancies in adjunct positions in the Business Department. See Pl. Tr., Exhibit "B," at 77: 20-25 – 78: 2, 78: 13-15, 79: 15-20.

*Response*

Admit.

122.   All adjunct faculty applicants approved by the Business Department's Departmental P&B Committee were hired by Kingsborough's administration. See Pl. Tr., Exhibit "B," at 86: 21 – 87: 14.

*Response*

Admit.

123.   Plaintiff does not know how adjunct positions are filled in other departments at Kingsborough. See Pl. Tr., Exhibit "B," at 81: 20 – 82: 2, 88: 1-5.

*Response*

Admit, except that historically, retired full-time faculty members are given the opportunity to teach as adjuncts.  (Stark Dec. Exhibit 1 p. 78:8-19; Exhibit 8 pp. 86:17-88:20.)

124.   Plaintiff is not aware of any policy at Kingsborough or CUNY on identifying potential adjunct faculty members. See Pl. Tr., Exhibit "B," at 84: 15-21.

*Response*

Admit, except historically, retired full-time faculty members are given the opportunity to teach as adjuncts.  Taras, however, refused to allow three well respected retiring faculty members from working as adjuncts.  In addition, Taras also refused to assign any classes to Sidney Weg for two semesters, making him ineligible to continue as an adjunct, and dissuaded Carla Beeber from working as an adjunct after she retired.  All five of these persons are known to be Jewish.  (Lax 78, Yarmish 87)

40

125.    Plaintiff claims that, in 2009 or 2010, then-Biology Department Chair Loretta Taras discriminated against Jewish former full-time faculty members who sought to teach as adjuncts after retirement. See Pl. Tr., Exhibit "B," at 301: 7-10, 302: 19-23, 304: 7-8.

*Response*

Admit.

126.    Plaintiff identifies Gary Sarinsky, Teddy Markus, and Arthur Zeitin as retired full-time professors who identified as Jewish, but were denied adjunct positions by Taras in 2009 or 2010. See Pl. Tr., Exhibit "B," at 301: 7-10, 304: 7-8.

*Response*

Admit except Taras also refused to assign any classes to Sidney Weg for two semesters, making him ineligible to continue as an adjunct, and dissuaded Carla Beeber from working as an adjunct after she retired.  (Stark Dec. Exhibit 1 p. 78:8-19; Exhibit 8 pp. 86:17-88:20; Exhibit 18.)

127.    Taras generally elected not to assign courses to these individuals because she disagreed with their teaching styles and because they insisted on teaching particular courses at particular times that would have presented issues and inconveniences. See Taras Tr., Exhibit "R," at 248: 5-11, 249: 5-11.

*Response*

Deny.  This so-called explanation is a pretext for discrimination by Taras, who refused to allow these three well-respected retiring Jewish faculty members from working as adjuncts.  Taras also refused to assign any classes to Sidney Weg for two semesters, making him ineligible to continue as an adjunct, and she dissuaded Carla Beeber from working as an adjunct after she retired.  All five are known to be Jewish.  Moreover, Taras cannot identify any non-Jewish faculty members whom she denied an adjunct position after retirement.  Suss was aware that Taras was

41

preventing Jews from working as adjuncts, as he was contacted by all five retired faculty members. Yet instead of referring their complaint to the Chief Diversity Officer for an investigation, Suss ignored the issue, claiming that he did not wish to interfere with the decisions of a department chair. Management-level employees/administrators at Kingsborough are required to refer all complaints of discrimination to the Chief Diversity Officer. (Stark Dec. Exhibit 1 p. 78:8-19; Exhibit 2 p. 240:22; Exhibit 4 pp. 93:23-94:4; Exhibit 6 p. 52:11-23; Exhibit 8 pp. 86:17-88:20; Exhibit 12 p. 56:10-17; Exhibit 13 p. 231:14-19.)

128.    Other than in 2009 and 2010, for the individuals listed above, Plaintiff does not know whether any recently retired Jewish faculty members sought to serve as adjuncts but were denied the opportunity, nor does he know whether non-Jewish retirees were similarly treated. See Pl. Tr., Exhibit "B," at 306: 25.

*Response*

Deny.    Taras prevented Carla Beeber from becoming an adjunct when she retired. Immediately after Taras was promoted and no longer served as the Biology Department Chair, Carla Beeber started working as an adjunct. (Taras 231:14-19.) Taras cannot identify any non-Jewish faculty members whom she denied an adjunct position after retirement. (Stark Dec. Exhibit 13 p. 231:14-19.)

129.    During her time as Biology Department Chair, Taras hired multiple Jewish individuals as adjuncts. See Taras Tr., Exhibit "R," at 231: 23 – 232: 6.

*Response*

Deny. Taras is able to identify only three Jewish persons she hired during her tenure as the Biology Department Chair, and she was unaware, until after they had already been hired, that they

42

were Jewish.  None of these persons wore or displayed any clothing or symbols indicating they were Jewish when they appeared for interviews. (Stark Dec. Exhibit 13 pp. 231:1–234:25.)

130.    The Business Department has Jewish adjunct faculty members, and Plaintiff believes there are Jewish adjunct faculty members in other departments. See Pl. Tr., Exhibit "B," at 312: 7-8.

*Response*

Admit, except that there are departments that would never hire Jews.  (Stark Dec. Exhibit 8 pp. 56:3-57:3.)

131.    Suss played no role in selection of adjunct professors, and there is no link between Taras's adjunct hiring practices and Suss. See Taras Tr., Exhibit "R," at 250: 21-25.

*Response*

Deny.  Management-level employees/administrators at Kingsborough are required to refer all complaints of discrimination to the Chief Diversity Officer.  Yarmish informed Suss that Taras was discriminating against Jews by preventing Jewish persons from working as adjuncts.  Instead of referring this complaint to the Chief Diversity Officer for an investigation, as Kingsborough policy requires, Suss ignored the complaint.  (Stark Dec. Exhibit 1 p. 78:8-19; Exhibit 2 p. 240:22; Exhibit 4 pp. 93:23-94:4; Exhibit 6 p. 52:11-23; Exhibit 8 pp. 86:17-88:20.

**VIII.    Jewish Faculty Hires**

132.    During his time at Kingsborough, Suss hired and promoted numerous Jewish faculty members – including Plaintiff. See Pl. Tr., Exhibit "B," at 249: 24, 251: 8-10.

*Response*

Deny.  Suss did not promote Plaintiff or other Jewish faculty members.  The promotions were made based upon a vote of the college-wide P&B Committee.  Suss bent over backwards to

prevent Jewish faculty members from receiving promotions.  In May 2013 Suss manipulated both the college-wide P&B Committee vote and Plaintiff's appeal in an effort to prevent Jewish faculty members from receiving promotions.  For example, after stating numerous times that there were too many Jews at Kingsborough Suss (1) prevented qualified college-wide committee members from casting their votes, (2) permitted a person who was not a college-wide committee member to vote, (3) withheld information about the credentials and qualifications of Jewish faculty members from the review committee and the college-wide committee, and permitted a different number of persons to vote on Plaintiff's candidacy for a promotion than for others' candidacy, (5) attempted to prevent Plaintiff from appealing the denial of his promotion, and (6) altered the membership of the appeals committee after the President of Kingsborough overruled his attempt to preclude Plaintiff from pursuing his right to appeal.  (Stark Dec. Exhibit 1 pp. 227:23-25, 235:11-20, 236:12-20, 241:17-20, 242:1-242:25, 244:12-17 252:13-23, 254:13-23, 300:17-19, Exhibit 2 pp. 97:7-9, 100:1-101:25, 147:2-25, 183:11-25, 184:12-25, 185:8-12, 196:1-17, 199:14-16, 200:15-201:9; Exhibit 7;Exhibit 8 pp. 77:1-18, 102:20-103:9, 105:4-18; Exhibit 9; Exhibit 10, Exhibit 11; Exhibit 12 p. 72:8-22.; Ferretti Dec.; Goldstein Dec.)

133.    Plaintiff's Business Department was never dissuaded from presenting Suss with a candidate with a Jewish sounding name. See Pl. Tr., Exhibit "B," at 294: 5-17.

***Response***

Deny.  Suss's conduct and decision-making with respect to Orthodox and obvious Jews made his religious discrimination palpable.  Plaintiff recommended that Jewish candidates for faculty positions obviate Suss's prejudice by suppressing any religious signs and symbols when meeting with him.  (Stark Dec. Exhibit 1 p. 356:16-20.)

44

134. Except for the Associate Professors who were denied promotions at the May 23, 2013 College-Wide P&B Committee meeting, Plaintiff has not identified another Jewish faculty member who was denied a promotion. See Pl. Tr., Exhibit "B," at 280: 4-5.

*Response*

Deny. In addition to the Jewish faculty members who were denied promotions based on Suss's conduct in May 2013, all Jewish persons who were denied employment were also necessarily denied access to promotions. Also, Suss dissuaded Robert Singer, who is an obvious Jew, from running for a Chair position through threats. (Stark Dec. Exhibit 1 p. 274:14-22.)

135. Plaintiff is not aware of any less qualified candidates selected over Jewish candidates during his time at Kingsborough. See Pl. Tr., Exhibit "B," at 220: 25.

*Response*

Deny. While he cannot remember specific names, Plaintiff is aware that several non-Jewish candidates were hired to positions instead of more qualified Jewish candidates after he became Chair of the Business Department. (Stark Dec. Exhibit 1 p. 220:21:25.)

136. Plaintiff does not know which departments at Kingsborough were "not hiring Jews," but Plaintiff believes it was well-known that Suss did not want Jews. See Pl. Tr., Exhibit "B," at 492: 23 – 493: 8.

*Response*

Deny. Plaintiff knew that the Biology Department was not hiring Jews. Yarmish informed Suss that Taras was discriminating against Jews. Instead of referring this complaint to the Chief Diversity Officer for an investigation, as Kingsborough policy requires, Suss ignored the complaint. (Stark Dec. Exhibit 8 pp. 86:22-88:20.)

45

137.    In approximately 2010, Suss interviewed Shoshana Friedman, who identifies as Jewish, for a position in the Math Department. At her interview, Friedman wore traditional Jewish attire. Suss later hired Friedman. See Suss Tr., Exhibit "C," at 221; see also Yarmish Tr., Exhibit "K," at 44: 20-25.

*Response*

Admit, expect that Suss hired Shoshana Friedman as a last resort after discriminating against her because she was Jewish.  Suss initially refused to interview Shoshana Friedman because of her Jewish-sounding name, even though she was unanimously selected by the Math Department P&B Committee, and insisted upon interviewing a far less qualified Hispanic candidate who was not Jewish.  Only after Suss's Hispanic candidate, who was not selected by the Math Department P&B Committee, showed up late in unprofessional attire and gave a poor interview did Suss agree to interview Shoshana Friedman.  (Stark Dec. Exhibit 8 pp. 39:6-40:1, 56:1-12, 62:9-22.)

138.    Suss also interviewed Phillip Listowski, who identifies as Jewish, for a position in the Math Department. Listowski wore a traditional Jewish kippah (yarmulke) to the interview. Suss later hired Listowski. See Yarmish Tr., Exhibit "K," at 66: 4-12.

*Response*

Suss hired Listowski as part of a deal in which he forced Yarmish to agree to hire three non-Jewish persons before he would hire Listowski, who was a qualified Orthodox Jewish candidate.  (Stark Dec. Exhibit 8 pp. 54:7-15, 64:20-23,.)

139.    Plaintiff also alleges that "Suss overruled the Business Department's P & B Committee's unanimous decision to hire Dr. Dov Fischer . . . who had superior qualifications, based on discriminatory animus against Jews." See Am. Compl., Exhibit "A," at ¶ 46.

*Response*

Admit.

140.    In August 2011, Dov Fischer, who identifies himself as Jewish, was selected by the Business Department P&B Committee for hire as a full time faculty member. See Pl. Tr., Exhibit "B," at 283: 19-21, 284: 25 – 285: 4.

*Response*

Admit.

141.    After an affirmative vote by a department's P&B Committee, a potential new hire is interviewed by the President and/or Provost. See Pl. Tr., Exhibit "B," at 283: 19 – 284: 9.

*Response*

Admit.

142.    Fischer interviewed with Provost Suss and President Regina Perrugi in August 2011. See Pl. Tr., Exhibit "B," at 283: 19 – 284: 9.

*Response*

Admit.

143.    Based upon Fischer's unsatisfactory interview with them, Suss and Perrugi decided against hiring Fischer. See Pl. Tr., Exhibit "B," at 287: 15 – 288: 14.

*Response*

Deny.  Suss declined to hire Dov Fischer because he was an Orthodox Jew.  Suss believed that there were too many Jews at Kingsborough.  Dov Fischer complained that the decision not to hire him was motivated by religious discrimination.  (Stark Dec. Exhibit 2 p. 230:12-23; Exhibit 8 p. 77:1-8; Goldstein Dec.)

144.    The Business Department ultimately hired Michelle Davidowitz, who also identifies herself as Jewish, instead of Fischer. See Pl. Tr., Exhibit "B," at 385: 11-14.

*Response*

The testimony upon which Defendants rely provides no support for the contention that the Business Department ultimately hired Michelle Davidowitz instead of Dov Fischer. Kingsborough decided to hire Michelle Davidowitz only after Dov Fischer complained that the decision not to hire him was motivated by religious discrimination. (Stark Dec. Exhibit 1 p. 385:11-14).

**C.    Plaintiff's Hostile Work Environment Allegations:**

145.    Plaintiff alleges that religious discrimination motivated a hostile work environment at Kingsborough, that Suss fostered the "pervasively" hostile environment himself, and that "various high-level officials at Kingsborough were aware" of this environment and "allowed it to continue." See Am. Compl., Exhibit "A," at ¶¶ 87-89.

*Response*

Admit.

**I.    Alleged Comments by Suss**

146.    Plaintiff alleges that Suss made various undated comments denigrating Jewish faculty. See Am. Compl., Exhibit "A," at ¶¶ 40, 62.

*Response*

Admit.

147.    Suss never told Plaintiff that there were "too many Jews." See Pl. Tr., Exhibit "B," at 196: 6-8.

*Response*

Admit, except Suss stated to others, many times, that there were too many Jews at Kingsborough. Suss made these comments in the presence of Rina Yarmish, Michael Goldstein, August Tuosto, Larry Pero, and Robert Stigltz, and Ronald Forman. (Stark Dec. Exhibit 2 p. 230:12-23; Exhibit 8 p. 77:1-8; Goldstein Dec.)

148. Neither Rina Yarmish nor Michael Goldstein, two Jewish Kingsborough colleagues of Plaintiff's, told Plaintiff that Suss made any alleged statement regarding "too many Jews." See Pl. Tr., Exhibit "B," at 259: 24, 260: 11.

**Response**

Deny. Both Yarmish and Goldstein told Plaintiff that Suss stated many times in their presence that there were too many Jews at Kingsborough. The testimony upon which Defendants rely merely indicates that Yarmish and Goldstein did not tell Plaintiff that they heard Suss say *directly to them* that there were too many Jews at Kingsborough, but rather that the discriminatory comments were made to others in their presence. (Stark Dec. Exhibit 1 pp. 259:24, 260:11.)

149. Plaintiff alleges that, at unidentified times, Suss has called certain Jewish people "horrible," "the Devil," "crazy," "evil," and "the enemy." See Am. Compl., Exhibit "A," at ¶ 62.

**Response**

Admit.

150. Plaintiff does not contend that Suss ever referred to an individual as a "crazy Jew" or "horrible Jew." See Pl. Tr., Exhibit "B," at 377: 24 – 378: 4.

**Response**

Admit.

151. Plaintiff has not heard Suss ever call Jewish people as a group "horrible." See Pl. Tr., Exhibit "B," at 373: 13-15.

*Response*

Admit, except Plaintiff has heard Suss call many individual Jewish persons "horrible," "crazy," and "the devil," and has never heard Suss refer to a non-Jew in this derogatory way. (Stark Dec. Exhibit 1 pp. 373:20-25, 374:1-3, 378:15-20.)

152.    Plaintiff also claims that Suss offended him by speaking to Plaintiff in Yiddish. See Pl. Tr., Exhibit "B," at 346: 10.

*Response*

Deny.  Plaintiff was offended that every time that he encountered Suss, who began every conversation by ingratiatingly discussing kosher food, Jewish people, or rabbis, or by speaking Yiddish.  Plaintiff was offended because Suss did not treat him like a professional by discussing academic or business issues.  Instead Suss constantly interjected irrelevant Jewish matters into professional discussions.  Plaintiff's offense to this conduct grew after he complained to David Gomez about Suss's discriminatory behavior, describing this conduct as part of the complaint.  Rather than referring the complaint to the Chief Diversity Officer, as required, David Gomez convened a meeting between himself, Suss, and Plaintiff.  Yet again, and notwithstanding Plaintiff's complaint in which the habit was mentioned, Suss started the meeting by using Yiddish words, mentioning Kosher food, and discussing a rabbi.  (Stark Dec. Exhibit 1 pp. 346:1-347:25; Exhibit 2 pp. 257:1-258:25.)

153.    Suss does not know or speak Yiddish, excepting select Yiddish terms that are well known through the New York metropolitan area. See Pl. Tr., Exhibit "B," at 409: 8-10.

*Response*

50

Deny. Suss used certain Yiddish and Hebrew terms that are not well known in the New York metropolitan area. (Stark Dec. Exhibit 2 p. 258:17-23.)

154. Suss sometimes used such colloquially common Yiddish terms in conversation with both non-Jewish employees, such as David Gomez, as well as Jewish employees. See David Gomez Deposition Transcript ("Gomez Tr."), Exhibit "X," at 118: 15-20.

### Response

Deny. The testimony upon which Defendants rely does not concern a Yiddish word. The word is Hebrew, and David Gomez does not know what it means. Suss directed that term to Plaintiff. (Stark Dec. Exhibit 12 p. 118:15-20.)

### II. Anti-Semitic Vandalism

155. Plaintiff alleges that Kingsborough failed to investigate acts of anti-Semitic vandalism, including the defacing of an Israeli flag, the vandalizing of a Jewish faculty member's car, and the appearance of "numerous swastikas" on Kingsborough's campus. See Am. Compl., Exhibit "A," at ¶¶ 95-102.

### Response

Admit.

156. Plaintiff is not personally familiar with the allegation listed in paragraph "97" in the Amended Complaint, which states that an Israeli flag in Kingsborough's foreign language department has been defaced multiple times, and that "Kingsborough has not investigated" the incidents. See Am. Compl., Exhibit "A," at ¶ 97; see also Pl. Tr., Exhibit "B," at 502: 2-7.

### Response

Admit.

157.    Plaintiff alleges that on an unidentified date, faculty member Susan Aaronoff's car was vandalized in the Kingsborough parking lot. See Pl. Tr., Exhibit "B," at 499: 6-8.


**Response**

Admit, but Plaintiff does not remember specifically when the vehicle was vandalized. (Stark Dec. Exhibit1 p. 499:16-20.)

158.    Plaintiff is unaware of whether an investigation took place into the vandalism of Aaronoff's car. See Pl. Tr., Exhibit "B," at 501: 10-16.

**Response**

Deny.  Despite Plaintiff's request, no documents were produced in discovery establishing that an investigation was indeed conducted.  This is an admission by omission.

159.    Plaintiff identified only one or two occasions in his 13-year employment history at Kingsborough in which he may have seen a covered-up or removed swastika. See Pl. Tr., Exhibit "B," at 504: 17 – 505: 18, 513: 11-21.

**Response**

Deny.  No evidence has been presented that there were only one or two occasions in his thirteen-year employment history at Kingsborough in which Plaintiff saw a covered-up or removed swastika.  The testimony upon with Defendants rely does not say what it purports.  (Stark Dec. Exhibit 1 pp. 504:17–505:18, 513:11-21.)

160.    Plaintiff is unaware of whether Kingsborough investigated these swastikas. See Pl. Tr., Exhibit "B," at 506: 24 – 507: 7.

**Response**

Deny. Although requested, no documents were produced in discovery to establish that an investigation was indeed conduced. This is an admission by omission.

161.    Plaintiff also identified an undated incident in which Rina Yarmish told Plaintiff that a faculty member, Gloria Pollack, was subjected to a swastika carving and urine being left on her keyboard. See Pl. Tr., Exhibit "B," at 514: 19 – 516: 5.

*Response*

Admit.

162.    Plaintiff is unaware of whether Kingsborough investigated the alleged incident with Gloria Pollack. See Pl. Tr., Exhibit "B," at 515: 23 – 516: 4.

*Response*

Deny. Although requested, no documents were produced in discovery establishing that an investigation was ever conducted. This is an admission by omission.

163.    Plaintiff does not directly attribute any of the vandalism incidents he cites to Suss. See Pl. Tr., Exhibit "B," at 518: 17-20.

*Response*

Admit, except the fact that the vandalism was permitted to continue unabated Plaintiff attributes to the discriminatory, hostile atmosphere that Suss helped create.

**III.    Kosher Food**

164.    Plaintiff alleges that Suss "lobbied to eliminate Kosher food options" to dissuade Jewish faculty members from attending events. See Am. Compl., Exhibit "A," at ¶ 51.

*Response*

Admit. (See Am. Compl., Exhibit "A," at ¶ 53.)

165.     Plaintiff keeps Kosher, but has never asked for Kosher food at Kingsborough, and does not believe that Kosher food should be available at every Kingsborough event. See Pl. Tr., Exhibit "B," at 127: 1-4, 345: 14 – 346: 3.

**Response**

Admit.

**IV.     Scheduling Events on Jewish Holidays**

166.     Plaintiff alleges that Suss scheduled college events and interviews of Jewish candidates on Jewish holidays to exclude Jewish faculty members. See Am. Compl., Exhibit "A," at ¶¶ 54-55.

**Response**

Admit.

167.     Plaintiff is aware of only one time in which an interview was scheduled on a Jewish holiday (Shavuot), in which an interview related to the presidential search committee took place. Plaintiff served on that committee. See Pl. Tr., Exhibit "B," at 349: 11.

**Response**

Deny.  No evidence has been presented supporting the statement that Plaintiff was aware of only one time in which an event was scheduled on a Jewish holiday.  The testimony upon with Defendants rely does not say what it purports to say.  (Stark Dec. Exhibit 1 p. 349:11.)

168.     Suss had requested that the presidential search committee interview not be on a Jewish holiday. See Pl. Tr., Exhibit "B," at 352: 5-7.

**Response**

Deny.  Suss *told* Plaintiff that he had requested that the presidential search committee interview not be on a Jewish holiday.  This was contradicted by CUNY Central.  Plaintiff did not

get the opportunity to interview or meet with one-third of the finalists for the job because the interviews were scheduled on a Jewish holiday. (Stark Dec. Exhibit 1 pp. 352:1–353:25.)

169.     After Plaintiff was unable to attend the interview due to the holiday, CUNY invited Plaintiff to meet one-on-one with then-presidential candidate Farley Herzek at CUNY Central. See Pl. Tr., Exhibit "B," at 352: 24-25.

*Response*

Admit, except Plaintiff did not get the opportunity to interview or meet with one-third of the finalists for the job because the interviews were scheduled on a Jewish holiday. (Stark Dec. Exhibit 1 pp. 352:1–353:25.)

170.     Plaintiff is able to take off Jewish holidays and is paid for those holidays. See Pl. Tr., Exhibit "B," at 356: 6-10.

*Response*

Admit.

**V.     CUNY Affirmative Action EEO Statement**

171.     Plaintiff claimed, for the first time at his deposition, that Suss had removed "religion" as a protected characteristic on Kingsborough's job listings' EEO statements. See Pl. Tr., Exhibit "B," at 313: 4 – 316: 4.

*Response*

Deny. On September 13, 2015, Plaintiff complained that in furtherance of the discriminatory hostile work environment Suss had removed "religion" as a protected characteristic on the EEO statements contained in Kingsborough's job listings. Although the Chief Diversity Officer received Plaintiff's complaint, she did not investigate Suss's role in removing "religion" as a

protected characteristic on the EEO statements.  (Stark Dec. Exhibit 4 pp. 155:10-12; 160:16-20; 163:15-164:20.)

172.      Since October 2009, Kingsborough has issued job listings through "CUNYfirst," an electronic database managed by CUNY's central office. See Declaration of Anne Chamberlain, dated December 10, 2017 ("Chamberlain Decl."), at ¶ 4.

*Response*

Deny.   Kingsborough's Human Resources Department and the Provost's office share responsibility for posting advertisements for available employment at Kingsborough.  (Stark Dec. Exhibit 6 p. 151:7-16.)

173.      Administrators at the college level, such as Kingsborough administrators, cannot alter or modify CUNYfirst job listings or the language associated with those listings, as all job listings are posted and formatted centrally by CUNY. See Chamberlain Decl., at ¶ 5.

*Response*

Deny having information sufficient to form a belief concerning whether Kingsborough administrators can alter or modify CUNYfirst job listings.  The point is immaterial, however, because Kingsborough's Human Resources Department and the Provost's office shared responsibility for posting advertisements for available employment at Kingsborough.  (Stark Dec. Exhibit 6 p. 151:7-16.)

174.      CUNYfirst job listings include CUNY's EEO statement regarding affirmative action hiring, which are based upon federal requirements. See Chamberlain Decl., at ¶¶ 6-7.

*Response*

No response is required for this statement because it does not contain any material facts and instead calls for a legal conclusion.

175.     Religion has never been listed as an affirmative action characteristic on CUNYfirst job listings for Kingsborough during the relevant period of this action. See Chamberlain Decl., at ¶¶ 8-9.

*Response*

The point is immaterial because Kingsborough's Human Resources Department and the Provost's office shared responsibility for posting advertisements for available employment at Kingsborough. (Stark Dec. Exhibit 6 p. 151:7-16.)

**VI.     Alessandrini Re-Appointment**

176.     Plaintiff alleges that Suss unilaterally reversed a College-Wide P&B Committee decision to non-reappoint Anthony Alessandrini who had "published strong support for suicide bombings and other terrorist attacks against Jews." See Am. Compl., Exhibit "A," at ¶ 92, see also Pl. Tr., Exhibit "B," at 450: 9-13.

*Response*

Admit.

177.     Alessandrini's non-reappointment and subsequent reversal occurred in 2009 or 2010. See Pl. Tr., Exhibit "B," at 450: 3-9.

*Response*

Deny.  Alessandrini's non-reappointment and subsequent reversal occurred in 2011.  (See Am. Compl., Exhibit "A," at ¶92; Lax 493: 12-14.)

178.     Suss has never voiced support for suicide bombings or terrorist attacks against Jews. See Suss Tr., Exhibit "C," at 224: 11-13.

*Response*

Deny.  Suss endorsed Alessandrini's support of suicide bombing and blamed the victims for being killed instead of the perpetrators.  (Stark Dec. Exhibit 1 pp. 368:1-369:22; Exhibit 8 pp. 122:18-123:17.)

**D.     Plaintiff's Retaliation Allegations:**

**I.          Plaintiff's Communications**

179.     Although Plaintiff alleges that he issued a complaint regarding discrimination to Julie Block-Rosen on March 17, 2014, neither Plaintiff nor Kingsborough have any record of such complaint being made. See Am. Compl., Exhibit "A," at ¶ 110.

*Response*

Admit, except the point is immaterial.  Management-level employees and administrators at Kingsborough are required to refer all complaints of discrimination to the Chief Diversity Officer, yet the referenced complaints were apparently never documented, for two reasons.  First, management-level employees and administrators at Kingsborough have a history of failing to report complaints of discrimination to the Chief Diversity Officer.  David Gomez, Suss, and Block-Rosen all received complaints of discrimination/retaliation, many concerning Suss's conduct, yet they failed to refer them to the Chief Diversity Officer.  Second, nothing was done to document other complaints that did get referred to the Chief Diversity Officer.  According to the current Chief Diversity Officer, her predecessor's records were sloppy and unreliable.  During her brief tenure the current Chief Diversity Officer also failed to document and investigate at least two discrimination/retaliation complaints.  (Stark Dec. Exhibit 1 pp. 471:12-25, 472:1, 526:7-25, 527:1-25, 528:1-12; Exhibit 2 pp. 240:22-241:10, 246:18-247:3, 249:17-23, 250:17-23; Exhibit 3 pp. 126:5-14, 131:3-9, 139:22-140:8; Exhibit 4 pp. 93:3-18, 106:4-16, 143:2-144:7, 183:12-184:2;

Exhibit 6 pp. 51:14-52:23; Exhibit 12 pp. 52:20-53:10, 54:2-14, 55:17-22, 57:1-17, 70:7-71:12, 77:17-78:20, 80:3-14, 103:6-104:8, 111:3-113:9, 128:10-129:5, 140:23-141:10.)

180.    In contrast, Plaintiff emailed Julie Block-Rosen on March 26, 2014 indicating that he believed Suss was retaliating against him because he filed a grievance about voting procedures, not discrimination. See Email from Jeffrey Lax to Julie Block, dated March 26, 2014, Exhibit "Y."

*Response*

Deny.  Plaintiff emailed Block-Rosen on March 26, 2014.  Plaintiff believed that Suss had implemented a voting procedure designed to deny Orthodox and obvious Jews promotions, which is an act of religious discrimination, and complained that Suss was retaliating against him because he had filed a grievance concerning this discriminatory conduct.  .Plaintiff also made a complaint of religious discrimination to Block-Rosen.  Afterward, not only did Block-Rosen fail to notify the Chief Diversity Officer, she stopped communicating altogether with Plaintiff.  (Stark Dec Exhibit 1 pp. 153:19–25, 471:12-25, 472:1, 526:7-25, 527:1-25, 528:1-12; Defendants' Exhibit Y.))

181.    Although Plaintiff alleges that he issued a complaint regarding discrimination to Interim Provost David Gomez on June 3, 2014, neither Plaintiff nor Kingsborough have any record of such complaint being made. See Am. Compl., Exhibit "A," at ¶ 114.

*Response*

Admit, except the point is immaterial.  Management-level employees and administrators at Kingsborough are required to refer all complaints of discrimination to the Chief Diversity Officer, yet the referenced complaints were apparently never documented, for two reasons.  First, management-level employees and administrators at Kingsborough have a history of failing to report complaints of discrimination to the Chief Diversity Officer.  David Gomez, Suss, and Block-Rosen all received complaints of discrimination/retaliation, many concerning Suss's conduct, yet

59

they failed to refer them to the Chief Diversity Officer. Second, nothing was done to document other complaints that did get referred to the Chief Diversity Officer. According to the current Chief Diversity Officer, her predecessor's records were sloppy and unreliable. During her brief tenure the current Chief Diversity Officer also failed to document and investigate at least two discrimination/retaliation complaints. (Stark Dec. Exhibit 1 pp. 471:12-25, 472:1, 526:7-25, 527:1-25, 528:1-12; Exhibit 2 pp. 240:22-241:10, 246:18-247:3, 249:17-23, 250:17-23; Exhibit 3 pp. 126:5-14, 131:3-9, 139:22-140:8; Exhibit 4 pp. 93:3-18, 106:4-16, 143:2-144:7, 183:12-184:2; Exhibit 6 pp. 51:14-52:23, Exhibit 12 pp. 52:20-53:10, 54:2-14, 55:17-22, 57:1-17, 70:7-71:12, 77:17-78:20, 80:3-14, 103:6-104:8, 111:3-113:9, 128:10-129:5, 140:23-141:10.)

182.     In approximately September 2014, Plaintiff and Interim Provost David Gomez had a conversation in which Plaintiff stated that Suss was an "anti-Semite." See Gomez Tr., Exhibit "X," at 52: 13 – 54: 18.

*Response*

Admit, except the point is immaterial. Management-level employees and administrators at Kingsborough are required to refer all complaints of discrimination to the Chief Diversity Officer, yet the referenced complaints were apparently never documented, for two reasons. First, management-level employees and administrators at Kingsborough have a history of failing to report complaints of discrimination to the Chief Diversity Officer. David Gomez, Suss, and Block-Rosen all received complaints of discrimination/retaliation, many concerning Suss's conduct, yet they failed to refer them to the Chief Diversity Officer. Second, nothing was done to document other complaints that did get referred to the Chief Diversity Officer. According to the current Chief Diversity Officer, her predecessor's records were sloppy and unreliable. During her brief tenure the current Chief Diversity Officer also failed to document and investigate at least two

discrimination/retaliation complaints. (Stark Dec. Exhibit 1 pp. 471:12-25, 472:1, 526:7-25, 527:1-25, 528:1-12; Exhibit 2 pp. 240:22-241:10, 246:18-247:3, 249:17-23, 250:17-23; Exhibit 3 pp. 126:5-14, 131:3-9, 139:22-140:8; Exhibit 4 pp. 93:3-18, 106:4-16, 143:2-144:7, 183:12-184:2; Exhibit 6 pp. 51:14-52:23; Exhibit 12 pp. 52:20-53:10, 54:2-14, 55:17-22, 57:1-17, 70:7-71:12, 77:17-78:20, 80:3-14, 103:6-104:8, 111:3-113:9, 128:10-129:5, 140:23-141:10.)

183.    In response, Gomez asked Plaintiff to provide him with any evidence of discrimination by Suss, but Plaintiff did not respond to Gomez's request. See Gomez Tr., Exhibit "X," at 52: 13 – 54: 18.

*Response*

Deny.  Plaintiff provided Gomez with several examples of disparate treatment, including a fifteen-point list of ways that Plaintiff was treated less favorably than his comparators.  Gomez violated Kingsborough policy by personally assessing the quality of Plaintiff's complaint instead of referring it to the Chief Diversity Officer.  After Plaintiff made additional discrimination complaints about Suss, Gomez decided to convene a meeting among himself, Suss, and Plaintiff, which is also a violation of Kingsborough Policy.  Plaintiff complained after the meeting and Gomez still did not refer the matter to the Chief Diversity Officer. (Stark Dec. Exhibit 12 pp. 52:20-53:10, 54:2-14, 55:17-22, 57:1-17, 70:7-71:12, 77:17-78:20, 80:3-14, 103:6-104:8, 111:3-113:9, 128:10-129:5, 140:23-141:10.)

184.    Plaintiff also had a verbal conversation with CUNY's Chief Diversity Officer ("CDO"), Pinar Ozgu, on May 11, 2015. See Pl. Tr., Exhibit "B," at 519: 18-23.

*Response*

Admit.

61

185.    During the May 11, 2015 conversation, Plaintiff told Ozgu that he believed Suss was discriminating against him. See Pl. Tr., Exhibit "B," at 519: 18-23.

*Response*

Admit

186.    Ozgu responded by asking if Plaintiff wished to file a complaint. See Pl. Tr., Exhibit "B," at 521: 24 – 522: 1.

*Response*

Ozgu violated Kingsborough policy by requiring Plaintiff to file a written complaint.  The policy is that when any discrimination or retaliation complaint is received, an investigation must be commenced.  (Stark Dec. Exhibit 4 pp. 59 – 60.)

187.    Plaintiff chose not file a complaint on May 11, 2015. See Pl. Tr., Exhibit "B," at 521: 24 – 522: 1.

*Response*

Deny.  Plaintiff made a complaint of discrimination to Ozgu on May 11, 2015, and confirmed in writing to Ozgu that he wanted to proceed with the complaint.  (Stark Dec Exhibit 1 p. 519:18-23; Exhibit 16; Defendants' Exhibit Z.)

188.    Ozgu followed up with Plaintiff on multiple occasions about the possibility of Plaintiff filing a complaint, but Plaintiff chose not to file a complaint with Ozgu. See Email, from Pinar Ozgu to Jeffrey Lax, dated May 14, 2015, Exhibit "Z."

*Response*

Deny.  Plaintiff made a complaint of discrimination to Ozgu on May 11, 2015, and confirmed in writing to Ozgu that he wanted to proceed with the complaint.  (Stark Dec Exhibit 1 p. 519:18-23; Exhibit 16; Defendants' Exhibit Z.)

189.     In June 2015, Ozgu found that Plaintiff had retaliated against Anna Geller after concluding CUNY's investigation into Geller's complaint. See Pl. Tr., Exhibit "B," at 545: 14-16.

   *Response*

Admit, except the CUNY anti-retaliation policy is broader than federal, state, and local laws and has a lower threshold.  Without the benefit of legal guidance Plaintiff allegedly retaliated against Geller by questioning whether she had following the proper procedure to request a paid parental leave when she had not provided the required ninety days' notice and assigning Geller a schedule.  (Stark Dec. Exhibit 4 p. 121; Exhibit 5 pp. 104 – 110.)

190.     Following Ozgu's conclusion in the Geller investigation, Plaintiff did not file a complaint with CUNY regarding his own allegations because he did not believe Ozgu could be impartial. See Pl. Tr., Exhibit "B," at 539: 24 - 540: 543: 11.

   *Response*

Deny.  Plaintiff made a complaint of discrimination to Ozgu on May 11, 2015.  Thereafter, Plaintiff filed a grievance with his union because Ozgu did not pursue any investigation into his complaints whatsoever.  (Stark Dec. Exhibit 5 pp. 104–110.)

191.     On approximately October 20, 2015, Plaintiff filed a complaint with Kingsborough's CDO, Victoria Ajibade, alleging that Julie Block-Rosen had retaliated against him. See EEO Intake Form, dated October 20, 2015, Exhibit "AA."

   *Response*

Admit.

192.     Block-Rosen identifies herself as Jewish. See Block-Rosen Tr., Exhibit "U," at 90: 19-20.

*Response*

Admit.

193.     Plaintiff has never reported to Block-Rosen, and Block-Rosen does not supervise

Plaintiff. See Pl. Tr., Exhibit "B," at 153: 13-15.

*Response*

Admit.

Dated: New York, New York
       January 16, 2018

COREY STARK PLLC


   /s/
By: Corey Stark (CS-3897)
*Attorneys for Plaintiff*
110 East 59th Street, 22nd Floor
New York, New York 10022
(212) 324-3705
